757 So.2d 879 (2000)
STATE of Louisiana
v.
David SPAIN.
No. 99-KA-1956.
Court of Appeal of Louisiana, Fourth Circuit.
March 15, 2000.
*880 Laura Pavy, Louisiana Appellate Project, New Orleans, LA, Counsel for Defendant-Appellant.
Harry F. Connick, District Attorney of Orleans Parish, Nicole Barron, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff-Appellee.
*881 Court composed of Chief Judge ROBERT J. KLEES, Judge STEVEN R. PLOTKIN, Judge MICHAEL E. KIRBY.
PLOTKIN, Judge.
This case presents the question of what constitutes an unauthorized entry of an inhabited dwelling.
Defendant David A. Spain was charged by bill of information on January 29, 1999, with one count each of unauthorized entry of an inhabited dwelling, a violation of La. R.S. 14:62.3, and aggravated battery, a violation of La. R.S. 14:34. Defendant pled not guilty at his arraignment on February 3, 1999, but was found guilty of unauthorized entry of an inhabited dwelling and second degree battery on February 25, 1999, following trial by a six-person jury. The trial court sentenced defendant on May 17, 1999, to five years at hard labor on each count, with credit for time served and with the sentences to run concurrently. The trial court also granted defendant's motion for appeal on that date. On May 27, 1999, defendant pled guilty to a habitual offender bill of information. The trial court then adjudicated defendant a second-felony habitual offender, vacated the original sentence imposed in count one, and resentenced defendant to five years at hard labor, with credit for time served and with the sentence to run concurrently with the sentence in count two.

STATEMENT OF FACTS :
Brandie Schmock testified that, on November 8, 1998, at approximately 7:00 p.m., she was putting food away in her kitchen after a barbecue when someone suddenly knocked a plate out of her hands. She then saw defendant, who pushed her back against a refrigerator and caused her to fall down. Defendant ordered her to stay down and hit her on the arm with a hammer, causing a severe bruise. He then began striking a motorcycle parked in the kitchen with the hammer; the motorcycle belonged to Ms. Schmock's boyfriend, Mike Woods. Ms. Schmock ran out the back door and climbed over a fence to escape, while defendant ran out the front door and got on his bicycle. Defendant was later apprehended.
Ms. Schmock stated that she and defendant had had a five-year relationship, which had ended two years before the date of the attack. Defendant was the father of her five-year old daughter, whom he usually visited every weekend. Ms. Schmock said she lived in the residence, located at 330 N. Patrick Street, with her daughter and Mr. Woods. On the day in question, she and Mr. Woods were there, as were two other individuals. She stated that defendant did not have permission to be in her home that day and that she did not know he was there until he hit her. However, she admitted that defendant had been inside of the residence before that day. She did not observe anyone else give defendant permission to enter the residence, noting that everyone else had been in the front room. Ms. Schmock stated that she had no animosity toward defendant. She identified photographs of her table and her twenty-seven gallon fish tank, both of which had apparently been broken by defendant that day.
Ms. Schmock testified on cross-examination that she had stayed with defendant one time, some nine months before the attack, when she was experiencing a relationship problem. She admitted that she and defendant had remained friends after their relationship had ended. She said that she would usually take her daughter to defendant, but sometimes he would come to the N. St. Patrick Street residence to pick up his daughter. She also admitted that defendant had been invited to "a couple of barbecues" there. She said he would usually knock on the front door, unless it was already open. She admitted that she would not be surprised if he walked in her front door and admitted that she would not telephone police if he did so. Ms. Schmock also admitted that, if defendant had walked in her open back door on the day in question while acting reasonably, she would not have telephoned the *882 police. She conceded that, in essence, defendant had her permission to enter her residence when he was acting reasonably. Ms. Schmock recalled defendant saying something as he ran through the residence about her not letting him see his daughter.
Mike Woods testified that he had lived on N. St. Patrick Street for thirteen months. He said that, on the evening in question, he was in the living room with friends when defendant's daughter began screaming and yelling unintelligibly. Mr. Woods said defendant came "flying" out of the back swinging a hammer, or what he described as a two-pound maul. Defendant screamed at Mr. Woods that he was sitting in defendant's chair, and attempted to hit him in the head with the maul. Mr. Woods further testified that defendant broke the fish tank, causing twenty-seven gallons of water and fish to spill onto the floor, and cracked a coffee table. He added that defendant caused over eleven hundred dollars ($1,100.00) of damage to his Harley-Davidson motorcycle.

ERRORS PATENT :
Defendant cites as an error patent the trial court's apparent failure to advise him of the prescriptive period for filing an application for post conviction relief, as required by La.C.Cr.P. art. 930.8(C). However, this court does not recognize such an error patent. State v. Jones, 97-2217, p. 3, n. 1 (La.App. 4 Cir. 2/24/99), 731 So.2d 389, 392, n. 1, writ denied, 99-1702 (La.11/5/99), 751 So.2d 234. A review of the record reveals no other errors patent.

ASSIGNMENT OF ERROR NO. 1 :
In this assignment of error, defendant claims that the evidence was insufficient to sustain his conviction for unauthorized entry of an inhabited dwelling. Specifically, defendant contends that the State failed to prove beyond a reasonable doubt that his entry was unauthorized, given his history of access to the victim's residence.
In State v. Ash, 97-2061 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, writ denied, 99-0721 (La.7/2/99), 747 So.2d 15, this court summarized the standard of review that applies when a defendant claims that the evidence produced to convict him was constitutionally insufficient:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact's determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989). When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proved such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
*883 La. R.S. 14:62.3 A defines unauthorized entry of an inhabited dwelling as:
[T]he intentional entry by a person without authorization into any inhabited dwelling or other structure belonging to another and used in whole or in part as a home or place of abode by a person.
Under this definition, any particular act after the entry is not an element of the offense. Additionally, "an entry with the consent of the owner, express or implied, is not unauthorized." State v. Dunn, 263 La. 58, 267 So.2d 193, 195 (1972).
In Dunn, the Louisiana Supreme Court examined the simple burglary statute, La. R.S. 14:62, which required at that time, as it does now, both an unauthorized entry and an intent, at the time of entry, to commit a felony or a theft in the place entered. The entry in that case had been made into a building open to the public. The court found that entry into a building open to the public at the designated hours and within the designated confines was not an unauthorized entry, "regardless of the intent of the person so entering." 267 So.2d at 195-196.
In State v. Lozier, 375 So.2d 1333 (La. 1979), the court recognized its prior holding in Dunn, regarding entry into a public building, but cited 1 Wharton's Criminal Law, Charles Torcia, (ed.), 14th edition, 1978, § 46, p. 231, for the proposition that a consent defense to unauthorized entry into a private dwelling requires that the consent be "voluntary and intelligent, that is, based on a reasonable understanding of the identity and purpose of the intruder." 375 So.2d at 1336. It added, "[O]nce a maid, friend, or employee is given general consent to enter a house at certain times, that consent will generally remain valid until revoked or the terms of the consent [are] exceeded." Id.
The court in Lozier, which involved an unauthorized entry in the context of an aggravated burglary, reasoned that the significance of the consent of the occupant in such a case grew out of the rationale underlying laws proscribing burglary, which it found were "not designed primarily to protect the inhabitant from unlawful trespass and/or the intended crime, but to forestall the germination of a situation dangerous to the personal safety of the occupants." Id. at 1337. The Lozier court had no trouble finding that the defendant's entry was unauthorized, in that he was let into the dwelling once by an accomplice, who did not have the right to authorize his entry, and a second time by the owner, after the defendant represented himself and his accomplice as police officers. The court found that the defendant's misrepresentation prevented the occupant from sufficiently understanding the circumstances to give voluntary, intelligent consent.
In State v. McKnight, 539 So.2d 952 (La.App. 2 Cir.1989), writ denied, 548 So.2d 322 (La.1989), the defendant, armed with a knife, went to the home of her exhusband and stabbed him. She was convicted of aggravated burglary, which required, among other things, proof of an unauthorized entry into a dwelling with the intent to commit a felony or theft therein. There was a dispute as to how she came to enter the living room, but once there, she reached for her ex-husband's wife and eventually stabbed her exhusband. The defendant claimed on appeal that she had the implied consent of the victims to enter through the atrium into the living room. But the court rejected that argument, stating:
... [I]t is obvious that the Edwards couple did not voluntarily and intelligently consent to any entry by the defendant.... They simply were unable to respond quickly enough to the defendant's actions to keep her out of their living room....
Although the defendant was not a stranger to Mr. and Mrs. Edwards, they did not invite her to their home, nor did they invite her to enter, particularly considering the late hour, their prior relationship with the defendant, and the defendant's purpose in coming there. The *884 testimony of the Edwards couple clearly established that the defendant forced her way into their home without their permission. The record does not show that they consented to her entry. Under all these circumstances, we conclude that the defendant made an "unauthorized entry" of the inhabited dwelling occupied by the Edwards family.
539 So.2d at 958.
Of course, Lozier and McKnight are partially distinguishable from this case. Defendant did not misrepresent himself, as was the case in Lozier; the defendant in Lozier was a stranger to the occupant of the residence and impersonated a police officer to gain entry. Also, defendant enjoyed a closer relationship to the victim than did the defendant in McKnight; here, defendant could apparently enter the victim's residence through any open door, even at 7:00 p.m. on a November evening, without alarming the victim or the other residents.[1]
In light of the Louisiana Supreme Court's holding in Dunn, Ms. Schmock's concession that defendant could normally enter her home through any open door, front or rear, might initially appear to prohibit a finding of unauthorized entry. However, considering the Louisiana Supreme Court's later ruling in Lozier and the rationale in that case and in McKnight, we believe a rational jury could have found beyond a reasonable doubt that defendant's entry was unauthorized. The relevant question is not whether defendant could generally enter the victim's residence, but whether this particular entry was authorized. Ms. Schmock testified that defendant could freely enter her home provided that he was acting "reasonably" at the time of entry, i.e. in accordance with her expectations of civil, non-aggressive behavior.[2] Thus, her consentas broad as it waswas nevertheless conditional.
This is not a case where a resident allows a familiar person into her home and is then surprised by the latter's sudden criminal behavior. As a matter of common sense, Ms. Schmock would have not consented to defendant's entry if she had had the opportunity to see him approaching her rear doorafter climbing the fence around the secure backyardwhile angered and armed with a large hammer.[3] Therefore, it cannot be said that any implied consent by Ms. Schmock for defendant to enter her residence before the attack was "voluntary and intelligent, that is, based on a reasonable understanding of the identity and purpose of the intruder." Lozier, 375 So.2d at 1336 (emphasis added). Or, in other words, a rational jury could have found beyond a reasonable doubt that "the terms of the consent [were] exceeded." Id.
In sum, viewing the totality of the evidence in the light most favorable to the State, we hold that a rational trier of fact could have found that all of the elements of unauthorized entry of an inhabited dwelling were proven beyond a reasonable doubt. There is accordingly no merit to this assignment of error.

*885 ASSIGNMENT OF ERROR NO. 2:
In his second and final assignment of error, defendant claims that the trial court erred in instructing the jury as to the lesser and included offense of second degree battery.
La.C.Cr.P. art. 802 mandates that the trial court instruct the jury as to the law applicable in each case. In State v. Jones, supra, this court stated:
A jury charge must be considered as a whole, and particular expressions in a charge must be construed in context of the entire charge. A conviction will not be reversed on the ground of an erroneous charge unless the disputed portion, when considered in connection with the remainder of the charge, is erroneous and prejudicial. The standard to be used when considering an allegedly improper jury instruction is whether there is reasonable likelihood that the jury applied the challenged instruction in an unconstitutional manner. State v. Smith, 91-0749 (La.5/23/94), 637 So.2d 398.
97-2217 at p. 12, 731 So.2d at 396-397 (quoting State v. Shaw, 27,892, p. 9 (La. App. 2 Cir. 4/3/96), 672 So.2d 237, 244).
The trial court gave its instruction to the jury regarding the four possible verdicts to the charge of aggravated battery: guilty of aggravated battery; guilty of second degree battery; guilty of simple battery; and not guilty. The trial court then instructed the jury as to the elements of the three offenses. After approximately one hour and forty minutes of deliberation, the jury returned with a question as to the distinction between aggravated battery and second degree battery, namely whether second degree battery involved, or could involve, a weapon. The following colloquy transpired:
THE JUROR:
The question has to do with Count Two and we just need a clarification with aggravated and second degree battery. What we wanted to know, with second degree, does that include a weapon?
THE COURT:
No. The definition of second degree does not include a weapon. By definition, the person does not have to have a weapon to be guilty of second degree battery. It'sas I said, it was the battery committed without the consent of the victim, a battery committed without the consent of the victim when the offender intentionally inflicts serious bodily injury. Those are the three elements.
MR. MEYER [DEFENSE COUNSEL];
Judge, I'm objecting. Are you saying that there cannot be a weapon in the second degree battery? I don't think that's
THE COURT:
I'm saying that the law does not require that in order for someonethe question was, as I understood the question, was it a requirement that a person have a weapon in order to be convicted of second degree battery. The law does not require that a person have a weapon in order to be convicted of second degree battery. The law does not
A JUROR:
Oh, but they could have
A JUROR:
But they could have a weapon and be convicted.
A JUROR:
With second degree. A weapon
(Several jurors speaking at once)
A JUROR:
A weapon can be involved is what we're asking, for second degree.
THE COURT:
Well, the charge is that of aggravated battery. The charge of aggravated battery requires that the person commit a battery with a dangerous weapon, okay? Now, you have the discretion as jurors, you have the discretion to do what you think is just and right. In other words, you canyou canand I'm just hypothetically *886 I'm not speaking trying to influence anybody but you could come to the conclusion that, We, as a jury, believe that the man had a weapon but we wish to find him guilty of some lesser charge which is not, for instance, like a second degree battery or a first degree battery where there's no weapon required. I mean, you could do that. Or not guilty. I mean, that's yourthat's your business.
A JUROR:
Okay.
THE COURT:
Okay?
A JUROR:
That's exactly what we wanted to know....
The trial court obviously did its best to address the concerns expressed by the jurors as to this issue and, from a reading of the colloquy, did so without prejudicing defendant in any way. The jury wanted to know whether it could find defendant guilty of second degree battery even though he had a weapon, since the definition given by the trial court in its original instruction did not mention anything about a weapon with regard to second degree battery. The jury returned to deliberate and found defendant guilty of the lesser offense of second degree battery, even though the evidence clearly showed that defendant was armed with a hammer or maul that could cause serious injury.
Nevertheless, to protect the rights of his client, defense counsel objected following the colloquy, stating that he believed the trial court had confused the jury. Defense counsel claimed that the court had insinuated that, if the jury found there was a dangerous weapon, they could not return a verdict of guilty of second degree battery. That was the ground of the objection at trial: that the instruction would somehow preclude the jury from returning a verdict of guilty of second degree battery.
However, the ground of defendant's objection at trial was rendered moot by the rendition of the responsive verdict of guilty of second degree battery. Defendant claims on appeal, though, that the trial court "never really answered the juror's question of whether a weapon can be involved for second degree battery" and submits that, if a weapon is allowed to be used in a conviction for second degree battery, then no difference would exist between the crimes of second degree battery and aggravated second degree battery, involving a second degree battery committed with a weapon and intentional infliction of bodily injury. Defendant also asserts that the trial court's erroneous charge prevented the jury from considering the true elements of the crime of simple battery, the least serious of the responsive verdicts, claiming that it is impossible to determine whether the jury would have chosen to convict defendant of simple battery, rather than the offense of second degree battery.
A defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error. La.C.Cr.P. art. 841(A); State v. Seals, 95-0305, p. 5 (La.11/25/96), 684 So.2d 368, 373, cert. denied sub nom Seals v. Louisiana, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). Not only does an objection have to be made, but La.C.Cr.P. art. 841(A) also requires that a defendant make known the grounds for his objection. A defendant is limited on appeal to the grounds articulated at trial. State v. Buffington, 97-2423, p. 9 (La.App. 4 Cir. 2/17/99), 731 So.2d 340, 346.
Because trial counsel did not object to the instruction on the grounds asserted by defendant on appeal, defendant is precluded from arguing those grounds. Moreover, the new grounds are without merit. The trial court did not define second degree battery to include a weapon as an element, but it clearly and correctly informed the jury that it could find defendant guilty of the lesser offense of second degree battery even if it found that defendant had a weapon. And in any event, *887 defendant fails to specify how the trial court's instructions regarding second degree battery prevented the jurors from discussing and rejecting the responsive offense of simple battery.
Because this assignment of error is also without merit, and because there are no errors patent, defendant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] It is also true that the instant case concerns an unauthorized entry, not an aggravated burglary, as was the case in Lozier and McKnight. However, the rationale underlying the statute proscribing unauthorized entry of an inhabited dwelling must be considered the same as that underlying the burglary statute, as both are contained in the same subsection of the Louisiana Revised Statutes.
[2] We note that the victim never testified that she had specifically informed defendant that he could enter her residence, without invitation and through any open door, only if he intended to act "reasonably." However, to the extent that defendant believed that he had the victim's standing permission to enter her home for any purposeeven for the purpose of attacking herhis belief was unreasonable.
[3] The record is unclear as to whether defendant armed himself with the hammer before or after he entered the residence. However, neither Ms. Schmock nor Mr. Woods indicated that they recognized the hammer as one owned by either of them, even though each described it. The jury could thus have inferred that defendant approached and entered the residence while carrying the hammer.